Good morning, Your Honors. My name is Michael Donahoe. I work with the Federal Defenders in Helena, Montana, and I'm here on behalf of the Juvenile today. We bring three claims. I intended to address them in the order that they were in the briefing unless the Court has some other way they'd like me to go about that. The first issue, which I think is the most significant one, involves the selection of the remedy for the Juvenile Delinquency Act violations. Here, as the Court knows, Judge Siebel decided to suppress rather than dismiss, and I think that's the heart of our claim, that he should have dismissed rather than suppressed. I think a useful way maybe of looking at this might be to think about it the way the government presents it in the briefing. And the core argument for the United States here is, look, Judge Siebel suppressed. He suppressed the DNA. He suppressed the confession. All the material evidence that was taken from this boy was not under consideration by Judge Siebel in the trial proper. And add to that the fact that Judge Siebel was indeed persuaded, beyond a reasonable doubt, by the individual testimony of the youngster, the victim, S.G., that she had been raped, that she had been forcibly set upon, and what else would you want? And the problem with that analysis is that it doesn't use the proper reference point. The cases from this circuit say that when dismissal is on the table for egregious violations, and we argue that these violations were egregious here, the Court has to make the call as to whether or not the evidence that was gathered from the juvenile or the rights that were denied to the juvenile or to his parents resulted in information or evidence that factored into the charging decision. All right. Now, what – what – I think that's accurate in terms of the case law, and the question is, on this record, what indication is there that it factored into the charging decision? There is none. And it's not our burden. And I think the Court needs to clarify, based on the cases that I've been reading – Why is it your burden? Because this is a situation where that material, that information is exclusively within the prerogative of the government. We are not – No, no, no. You don't – what makes it your burden, and that's what you want to address, the Court did suppress it. You want dismissal. If suppression cures, dismissal isn't appropriate. It's going to be argued. So you want to tell us why suppression wasn't sufficient, don't you? Because suppression doesn't cure. That was a toothless remedy here. I respectfully, Your Honor, would further – Well, that's why – I would further question – Excuse me. That's why the judge asked you the question, and that's why you may want to respond to it. But you don't have to. Well, it was. It was a toothless remedy, Your Honor. It addressed nothing. It in no way rectified the situation. Well, counsel, let me just ask. Do you concede that the proceedings against your client were initiated on the basis of SG's statements, not on your client's confession? No, I don't concede that. All right. If not, let's assume that the information was filed based on what SG said, not based on your client's confession. If we don't concede that, isn't all that we need to know to find that the FJDA violations here were harmless is that the conviction, the initiation was not based on SG's statements, was not based, excuse me, on your client's confession. You say it was initiated only based on your client's confession. No, I don't say that. All right. Why were the proceedings initiated? I think, and it may take me a minute to get this across, but I understand this question very well, because I've turned it over in my mind several times. What we need to do here first is think about this more abstractly. You don't ask the party in the litigation whether or not they used something in deciding something. I have every respect for Mr. Archer. He's a fine advocate and a trusted colleague, and I have every confidence in the U.S. Attorney's Office in our district. Nevertheless, to conduct a test like this, I wouldn't ask the party what they did in making the decision. How are they going to sort that out? What we have to do is look objectively at the evidence. The evidence in this case, if we segregate out the confession, if we segregate out the DNA, and we put ourselves back in time at the time of charging, what have we got? We have a 12-year-old girl who drank excessive, by any standard, excessive amounts of alcohol for an adult, for a 300-pound man. Excessive amounts of alcohol in a very short period of time. We have denials by the 12-year-old to other people during the party that she did not have sex with this individual. We have a discrepancy in the government's opening statement as to how the child wound up in a certain area. I think the Carpet Mills area is what it's referred to. The government says she was taken in a car and left there. And this phantom woman found her, dialed 911 on a cell phone, and that's how the investigation got started. In fact, the trial proof showed that the child was taken from the residence, I think it's called the Orange House in the record, taken in the car, left at the Carpet Mills area, wandered around for several minutes, the individuals came back with the car, picked her up, put her back in the car, took her back to the Orange House. And then according to the child, she escaped from the house. The government didn't even have in its opening statement a carbon copy or a replica of what the child testified to at the trial proper. So what I'm saying is, on its merits, if you segregate out all of the evidence taken from the boy, you have a very different case here and a very much more difficult charging decision. It mattered a lot that they took this evidence from the boy. This case arises in June. The boy's confession is taken sometime right there, 20, 21, 22 June, something like that. The DNA swab is taken. The evidence is sent off and analyzed. Now, I'm assuming, I wasn't trial counsel, but I'm assuming that that scientific evidence entered into that equation. The confession, what exactly was the confession? It was that he had sex with her and kind of vague about whether she consented, as I recall. Well, he admitted to having sex with her. Right. He also said there was oral sex and anal sex. Right. Which she said there wasn't. Right. And she, no, she didn't address the oral sex or the anal sex at all. And I think he didn't say, but as to the critical issue, I mean, she said that too. So the critical issue was consent or lack thereof, even though he was dealing with a 12-year-old. And as to that, my recollection is that he was kind of vain. Well, I don't think he was vain. I think he had aversion. He had aversion of what went on, and it didn't comport exactly with what the 12-year-old said. And here's the thing. What I'm asking is, did he confess to nonconsensual sex with her? He did. And what did he say? He said that he had sex with her. Nonconsensual sex, I asked you. Forced sex. That's my understanding. That's what the statement was. And I think a critical fact here in terms of analyzing this case without the confession, without the DNA, for purposes of charging is, read carefully, and I think it appears that the DNA didn't matter either because she also agreed that, I mean, everybody agreed that he had sex with her, so the DNA didn't matter, did it? Well, I'm saying it did to charge him. It had to. That's what I'm here to do, Your Honors, to make a case that this is a tougher call for the government to charge without his evidence. That's the whole point of this argument. And I think a central feature of this, and I'm ready to close down on this issue, is if Your Honors would please take the time to review her testimony. I think it's in the 90s, 90 maybe through 93, of the ER, something like that. And it's tender. I don't mean to be not compassionate here. I recognize that these are difficult circumstances. But she says, as she reports the event, I was half on the bed, I was half off. And there's a crucial sentence in her testimony at the trial, and she says, I could not speak loudly. She says, no, I was saying no, and I could not talk very, I could not talk that loud. Now, what's in it? Do you know where in the record is the confession? It's not in the record. There was an account of it. I saw it someplace. You don't know where it is? I don't think it's in the ER. It's not in the ER. It's probably in the trial record, but it's not in the ER. Not something I can say. Judge Siebel did not. There was no confession evidence put on at the trial. I know that. Yeah. That's odd, because I did read it. That quotation that I gave Your Honors actually appears at ER 91, lines 16 through 17. From her. From her. Right. From her. But the overarching point I'm trying to make here is the analysis in CM is pretty clear, and I think Judge Berzon indicated that my assessment was the reference point, the appropriate reference point is the time of charging. Judge Siebel conducts no analysis in his order suppressing. There's just nothing there in terms of why dismissal is being rejected. The government was never called upon to make any kind of proffer as to how, if at all, the confession, the DNA, the evidence taken that resulted from the Juvenile Delinquency Act violations, factored into the charging decision. I guess the difference between this and the cases in which there's been a showing of, that the information would have been charged is that there certainly was other evidence that they had at the time. Substantial other evidence. And you're saying, well, it might not have been enough because it might have been questionable, but it certainly existed as opposed to it was all based on. No. I'm not questioning its existence. I'm questioning its merit. And I think by any measure, if you take out what was taken from the boy, it's just a much tougher charging call. Now, I gather that the government, you may want to reserve time. So I'll give you a choice of either answering this question or waiting to hear what the government says because I'm going to hypothesize what the government's going to say, which is they're going to say that it wasn't so egregious because it wasn't so obvious that, in fact, this person wasn't, was covered by the act at the time that the acts took place because he wasn't charged by a Federal information at the time or because the people who were doing the questioning were not sufficiently Federal agents. That's what I understand their argument to be. And I'm prepared to argue that there was no cross-appeal from Judge Siebel's ruling. We can't put that on the table now. Judge Siebel was clear in his ruling. He said that there was the Federal act. Well, I understand that, but that goes to egregiousness now. In other words, they would say, well, that may be, but we didn't realize that. That argument lacks clarity, especially given the fact that the tribal officers, and I think it was shown below in the pretrial record, that even the tribe had analogous rules. So whether these officers were functioning as Federal officers or tribal officers, they had the same rules, and they just decided to disregard them quite cavalierly in both instances to argue, for the government to argue that, well, we didn't know at this point in time whether it was going to be a Federal case or not. I'm sorry, Your Honor, I just don't think that's going to carry the day here. Okay. We'll give you a minute, Mr. Barrow. Thank you very much. May it please the Court. I'm Ryan Archer, Assistant United States Attorney out of Billings, Montana, and I represent the United States. First off, I'd like to point out to the Court, to excerpt of record, page 3, and this is Judge Siebel's order, essentially suppressing the statements in this case. And the top of the first full paragraph, second sentence, talks about the confession and says that the defendant was unsure if S.G. consented to having anal sex. After speaking with the defendant for an hour, he asked if he would agree to record a statement, and then it talks about what the recorded statement is there. Your Honor, I believe what the record shows in this case is that the confession was somewhat equivocal. It's nothing that the prosecution would hold out as, you know, the sole piece of evidence we would rely on this case as having. But the argument isn't that it was the sole piece. The argument was that it was a piece. Correct, Your Honor. I would just like to point out, following up on your comments in questioning Mr. Donahoe, that it wasn't a great confession in this case. He didn't really say it was nonconsensual sex. He essentially consented to having sex. Mr. Donahoe and I were talking about this case just in the lobby out here before arguments, and I was acknowledging to him that we're sort of in a fantasy land in this case. It's hard to say what would drive a prosecutorial decision. The government certainly acknowledges that. And what we're --. But it is true, is it not, that Judge Siebel didn't inquire? Yes, Your Honor. I believe he did inquire. Where? Well, I think it's implicit in Judge Siebel's findings if you look at the conclusion of his order. In the last paragraph, he contemplates whether or not dismissal is appropriate or whether or not suppression is sufficient. He says almost nothing. He does say almost nothing. But what he does say is that suppression is the appropriate remedy in this case. But we have no indication that he was applying the right standard. If the right standard is, in fact, was --. I mean, there are two elements, as I understand it. Egregiousness and whether it went into the information. And that does seem to me comes out of the case law. And it is disturbing to read the case law, frankly, and to see this happening time after time after time. And in this instance, the woman called the --. It's undisputed that she actually called and said she wanted to talk to her son. It was told she couldn't. Correct, Your Honor. And I will comment on the egregiousness here. Clearly, in our brief, we don't believe this is such an egregious violation because we're in sort of a catch-22 land. We're in a no-man's land, so to speak, because he's in tribal custody at this point. And even if federal prosecution and federal custody is contemplated down the road, she wasn't calling. He's in tribal custody being interviewed by federal agents who are saving, specifically saving the evidence for federal purposes. Yes. Let's break it down on the timeline, though. At the time the mother calls, the FBI agent has not shown up. At the time the mother calls, she's essentially calling, you know, the tribal ---- Who are being paid by the BIA. Correct. They are being paid by the BIA. Essentially BIA agents. Correct, Your Honor. And they are therefore bound by the Federal Juvenile Delinquency Act, are they not? Well, the BIA has two hats. The BIA can make tribal arrests, which they did in this case, and they can make federal arrests. Clearly, we're not cross-appealing the district court's decision, but down at the district court, we argued this was not federal custody. And we have actually since won a case with the district court showing that a BIA arrest, or at least arrest by tribal officers, was not a federal arrest. There was no federal custody. So we argued down below that it was not federal custody, it was tribal custody. But you lost. We lost. And we're not cross-appealing that. So we have to assume that that was so. We do. But the only thing that we're saying on appeal, though, is that because we're in this no-man's land, this was not a flagrant, egregious violation. Well, suppose it had been in tribal custody. Was it then okay to not tell his parents? If he was in tribal custody? Yes. In tribal custody, as the defense points out, there are tribal regulations. So it wasn't okay in any theory. So it was an egregious violation. There was no theory on which it was okay to do what was done. No, Your Honor. And that's why we're not appealing that. But what we are saying, though. How as a court, I mean, since we see case after case in which this is happening, do we deal with the fact that if the Federal Juvenile Delinquency Act is ever going to be enforced, maybe we have to get tougher in enforcing it? Let me be clear on this point, because as Your Honor points out, this is a very serious issue in this case. And we have since stopped the practice. And that's also why we're not cross-appealing this. We have instructed the agents, if they're in tribal custody and you go down to the reservation and it's a juvenile, whether they're in tribal custody, whether you anticipate federal prosecution, you have to comply by all means with the JDA. Which was the rule beforehand you're telling us, either under the tribal rules or under the federal rules. Either way, what they did, they shouldn't have done. In the Doe case, they said the Doe case, there's many Doe cases. But the one at 155 F3D. In that Doe case, essentially, which was where there was tribal jurisdiction, the court came down and specifically said if there's tribal jurisdiction, it is not necessarily federal jurisdiction. Now, if you have a BIA officer, it certainly can be a federal arrest, and it can be treated as such. But this is a different question. What we have now is an acknowledged violation of not just one, but a number of the requirements. And our question is, does this deserve essentially a strong deterrence remedy? And for that purpose, the fact that it violated any set of rules that might have applied seems pertinent. The question of whether he was in federal and tribal or tribal custody doesn't seem even pertinent to that question. The only reason it's pertinent is to show that this violation was not so egregious. Why is that? Why is that? When it was a violation, no matter what custody he was in. Judge Hawkins' dissent in that Doe case at the 155 F3D site talks about the catch 22 of the majority opinion, which is essentially the FBI could say, well, I thought he was in tribal custody. The tribal jurisdiction could say, well, we thought he was in federal custody. And then, but if he goes federal, it's not a tribal violation. While the tribal regulations have requirements, that would be a tribal issue, not a federal issue. On his face, wouldn't this be a violation of any rules? They hold him for 18 hours before they interrogate him. They don't tell his mother. They knew that she would tell him not to speak to them. These are certain safeguards. And to protect, running rush on over the rights and the safeguards that Congress indicated, but whether or not it's federal or tribal, aren't these egregious? These are not egregious for the very reason of this no man's land that we fall within. I really don't find it a coherent argument. I find it a coherent argument as a technical matter as to which applies and whether there was a violation of the Federal Juvenile Delinquency Act, which has already been resolved in this case. But if the question is whether this was behavior that should be, that shouldn't have been engaged in any event, I don't see how that has to do, what that has to do with this problem. Before you run out of time, I think you're going to want to tell us, let's assume all these things that everybody's saying is true. Why was suppression not sufficient? Why was dismissal required? Isn't that what we're down to? Yes, we are. Well, thank you, Judge Ferris. And I'm just trying to defend the agent here, so I'll just make a quick note in case he listens. What I'm trying to do is put myself in that FBI agent's shoes. When he's driving down, he doesn't know what's happened in the tribal custody. He's looking at what happened in federal custody, and I'm just, you know, in his defense, I don't think he was deliberately violating rights. But let me move on to Judge Ferris' point. Judge Ferris' point is exactly the case here, which is why was suppression sufficient in this case instead of dismissal? No case out of the Ninth Circuit has dismissed the information or the charges purely because of the egregiousness of the case. Now, the defense cites to C.W., the C.W. case. In that case, the information was dismissed, but that's because there was a finding of prejudice. The Court went on to talk about the egregiousness of the violation, but that was not solely violated. Right. So that's why, to me, the real problem here is that Judge Siebel made no explanation, and there is no indication that he even made that inquiry. He made a prejudice inquiry, but he didn't make the prejudice inquiry in terms of whether the information would have been filed or not. He didn't do that. That's correct, Your Honor. He did not run through the analysis, but I think what's clear in the record is that there was no prejudice in this case. Why is that? Okay. Now let's know why. Why? There was no prejudice because at the time, and again, this brings me back to how I started off. We are sort of in a fantasy land here of what would the prosecutor have decided. But let's look at what happened at the time of the arrest. The victim in this case was found wandering down the street. There was the 911 call, and the victim in this case then gets taken to the Indian Health Services where she complains of being raped. At that point, that was the cause of the arrest. The victim's complaint alone caused the defendant in this case to be arrested. By the time we reach the charge, we not only have the victim's complaint, but we have the medical evidence that was gathered at the Indian Health Services that shows that there is evidence of a forcible rape in this case. That is essentially what convicted the defendant in this case. That is what would be known to the prosecutor had the statements been put aside, set aside at the beginning. And that's all we relied on at trial. But why do they hold him for 18 hours? Why don't they let him call his mother? Your Honor, again, at that point, he's in the tribal jail down there, and I think, as Judge Ferris pointed out, we just have to concede that was a violation of either the tribal statute or the JDA. They should have done it, and they didn't. But what I think the court has to do in this case is move beyond that and say, what was the prejudice? All right. What was the timing? Now, when was Leland arrested? He was arrested to the time that she was taken to the hospital and the hospitals were done. Shortly thereafter. The same, I mean, within hours? The same night, hours, within hours. He was arrested within hours. I think if we look at the record, what happens is she goes to the Indian Health Service. She makes the complaint that she's been raped, and I believe within hours, that night, somewhere around midnight or 1 o'clock in the morning, he's arrested for both intoxication and for sexual assault. So it's a matter of hours that he's arrested just on her statement. And then when is the confession relevant to that? The confession then happens 18 hours later, after the medical exam is complete. After the results are in for the medical exam? I'm not sure if the record is clear whether we actually had results yet, but let's look at the charging decision. The charging decision in this case happens months later. So if we're looking at what was on the prosecutor's desk when you extract the statement, you clearly have the results of the medical exam, and you clearly have her statement. And let's talk about her statement. Defense counsel disparages her statement somewhat, but what's important in this case is that the defendant thought or, excuse me, the victim thought the defendant had AIDS. So she can say, there's no way I ever would have consented to having sex because I thought he had AIDS. That certainly adds credibility to the statement, and I know from talking with the prosecutor at the trial level that she was hammering home that point, that she would not have consented to sex with this defendant because she thought he had AIDS. And so you have a very strong victim statement, which, of course, the district court relied on heavily and almost exclusively in finding the defendant guilty in this case. And you have the medical evidence that corroborates that statement. Essentially, the entire taint of any violation of the JDA was removed by suppression. And while Judge Stiebel in his order didn't specifically go through the analysis of putting the prosecutor in that position, I think what's clear from his order is that he believes that suppression in this case totally removes that taint, and that's completely sufficient. Of course, it's a little all-artificial in this case anyway because he's also the trial judge, so he knows what was in the confession anyway. Your Honor is correct, but that's the nature of these juvenile cases, which he is the trial judge, so he does have that background knowledge. So the government's position would be simply that the defense has to prove prejudice. Dismissal should not be simply a sanction against the government. The court has never gone that far. There was no due process violation in this case. Unless there's further questions on the rape shield issue or anything else, we'll submit. Thank you very much. Sir. We'll give you a minute or so. I know Your Honor's just had a long day here, and I'm not going to make you appreciate that. We've had a long day, but we're willing to have long days. You've got something that you can tell us. Well, there's just a couple things that Ryan raises here. First of all, let's not lose sight of the fact that this child left the house unattended. Her mother was sleeping. She didn't tell her mother where she was going. She went with someone she was not supposed to be with. All right? So the point being that by the time she's found in the condition that she's in, she's got a lot of explaining to do. And if she does, she's got motive to cast blame and to tell a story. And I think with individuals this young, to say that she reported accurately. Remember, we're crediting the trial testimony where she comes in and says, this is what happened. For goodness sake, how could you remember, child? I think we have to ask ourselves that question. How could you remember? On this record, she could remember because it's not the first time it's occurred. Right. On this record. And we've got the record. Now, we aren't going to decide the case based on that. But when you say, how could she remember, she's not an innocent virgin who was picked up by some guy and raped. That's what I'm saying. And I think the last place, and I'll leave it here, is that this is a perfect opportunity for the Court to bring some clarification to some things here. This test could be clarified to say, if there was a remand, that Judge Sheet-Siebel should look to see whether a reasonable prosecutor in the circumstances used the information taken from the boy. Was it the tipping point in the prosecutorial decision? So your suggestion that we could now remand for a finding that wasn't made originally. I am. I am. Because I think there needs to be something on the table in terms of what did you know, Mr. Government, when did you know it, and how was that information ---- But most of it seems pretty clear about what they knew, right? Well, I think ---- Are you asking the hard question, because you said it both ways just now, is whether we're inquiring into what decision was actually made or what decision a reasonable prosecutor would have made. You said both. All right. Well, I don't think that we need to tax a reasonable prosecutor in the circumstances, because I don't think that we need to tax the government entity with some delving into their subjective, the inner workings of the prosecutorial decision. I think we should try and carve out some kind of objectivity here. But that question we don't need the district court for, right? Because that's not a factual question. Well, that's a factual question, unless Your Honor doesn't think the record's complete enough, in which case I'd want to clarify the record below. If Your Honor's not ---- if none of ---- if one of Your Honors is not convinced that the government had the confession, the DNA, and all of that information when they charged in September of 2008 ---- They had it. We know they had it. They had it. And I'm saying it's ---- And the point is, though, there's no doubt they had it. The DNA was totally irrelevant on either story, because there would have been DNA. And the confession was pretty measly. Yeah. But suffice it to say, I think it was the tipping point. It could have been the tipping point in the charging decision. All right. But that's a legal question, isn't it? All right. This was all clarifying and helpful. Thank you very much. The case of United States v. Juvenile A is submitted. And we are finally to the last case of the day, Wells v. Campbell.
judges: Farris, Nelson D. W., Berzon